DC33BERC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
    BETTY BERNHART, et al.,
3
                    Plaintiffs,
4
              v.                               13 CV 2935 (RPP)
5
    ASTA FUNDING, INC., et al.,
6
                    Defendants.
7   ------------------------------x
                                       New York, N.Y.
8                                      December 3, 2013
                                       4:15 p.m.
9
    Before:
10
                        HON. ROBERT P. PATTERSON, JR.,
11
                                          District Judge
12
                             APPEARANCES
13
    NEW YORK LEGAL ASSISTANCE GROUP
14       Attorneys for Plaintiffs
    BY:  DANIELLE TARANTOLO
15         JANE GREENGOLD STEVENS
           JULIA RUSSELL
16            -and-
    HUGHES HUBBARD & REED
17       Attorneys for Plaintiffs
    BY:  DIANE E. LIFTON
18         SHANNON GREEN

19

    TROUTMAN SANDERS
20       Attorneys for Defendants
    BY:  JOSHUA A. BERMAN
21         ERIC UNIS
           KAREN F. LEDERER
22
    DAVIDSON FINK
23       Attorneys for Defendant Pressler & Pressler
    BY:  GLENN M. FJERMEDAL
24
    PRESSLER & PRESSLER
25       Attorneys for Defendant Pressler & Pressler
    BY:  MITCHELL L. WILLIAMSON

DC33BERC

```
 1          (Case called)
 2          THE COURT:  Who is going to do the arguing?
 3          MS. TARANTOLO:  On behalf of the plaintiffs, your
 4  Honor, Danielle Tarantolo at the New York Legal Assistance
 5  Group.
 6          MR. BERMAN:  Your Honor, on behalf of the Asta
 7  defendants which are some of the defendants in the action, Josh
 8  Berman of the Trautman Sanders firm.  I have with me at counsel
 9  table Eric Unis and Karen Lederer.
10          THE COURT:  Josh Berman and who did you say?  Anyone
11  else arguing?
12          MR. BERMAN:  I don't believe so, your Honor, no.
13          THE COURT:  All right.  I guess in this case it is the
14  defendants' motion.
15          MS. TARANTOLO:  Correct, your Honor.
16          MR. BERMAN:  Yes, Judge Patterson, it is.
17          THE COURT:  You'll begin, Mr. Berman.
18          MR. BERMAN:  Thank you, sir.  Good afternoon, your
19  Honor.  Again, my name is Josh Berman on behalf of the Asta
20  defendants.
21          Just in the event that you don't recognize my name
22  from the filings today, the reason for that is that I am new to
23  the Trautman Sanders firm and I'm new to the case.  In fact, my
24  motion to appear was only filed yesterday on the docket.  So, I
25  wanted to bring that to your attention.  And one more thing,
```

DC33BERC

```
 1    judge Patterson --
 2              THE COURT:  I probably haven't granted it yet.
 3              MR. BERMAN:  Fair enough.  Well, would you grant it
 4    now?
 5              THE COURT:  I haven't seen it.
 6              MR. BERMAN:  It was just a notice of appearance.
 7              THE COURT:  That says where you were admitted, and I
 8    don't even know that you are admitted to the bar.
 9              MR. BERMAN:  I am, and I'm admitted to the Southern
10    District bar specifically.
11              THE COURT:  All right.
12              MR. BERMAN:  If the Court will accept --
13              THE COURT:  I thought maybe you were from out of
14    state.
15              MR. BERMAN:  No, sir.  From 42nd Street, so uptown,
16    but not out of state.
17              The other thing just to dispel any confusion at the
18    outset, I share the same last name with the general counsel of
19    Asta whose affidavit is before the Court, and I wanted to
20    clarify there is no relation.  That's a pure coincidence,
21    matter of happenstance.
22              So we are here on the Asta defendant's motion to
23    compel arbitration as to two of the named plaintiffs, Viruet
24    and Roberts.  And we've also moved for limited discovery as to
25    the two other named plaintiffs, Bernhart and Brito.
```

DC33BERC

1          So what I want to do at the outset is to dispel what I

2     think or what I anticipate may be the Court's principal concern

3     with respect to this motion right now.  And it is no secret,

4     which is our moving papers don't attach the specific account

5     agreement between the named plaintiffs in this case, and AT&T

6     Wireless.

7          I think a little bit of factual background would help

8     the Court in understanding why we don't have those readily

9     available and why that shouldn't be of any moment or of any

10     significant concern to the Court.

11          So, first off, the account agreements between account

12     holders and AT&T Wireless are not contracts in the sense that

13     we think of them as lawyers.  These are not documents that are

14     provided by AT&T, negotiated between the account holder and

15     AT&T, and signed in written format.  The way these work is the

16     way many long standard terms and conditions work.  So what

17     happens is you go to the AT&T store as an account holder, and

18     you say I want a wireless phone, I want to sign up for

19     such-and-such a rate plan, and the terms and conditions that

20     are provided to you at the time indicate that your acceptance

21     consists of using the account.

22          So once you open the account, you place a phone call,

23     receive a phone call, send a text message or receive a text

24     message, you are deemed to have accepted the terms and

25     conditions.  No one disputes that's a problem.  The plaintiffs

DC33BERC

1    haven't argued that these are problematic contracts of adhesion

2    or anything like that.

3            Now, the underlying transactions in this case where my

4    client purchased charged off accounts from AT&T occurred in

5    2004.  Specifically July of 2004.  And the way those

6    transactions work, is en masse.  In other words, Asta and its

7    affiliates buy tranches of charged off accounts.  So the

8    transactions that led to the events of this lawsuit, I'll say,

9    occurred almost a decade ago.

10           Since that time, this is sort of a key fact.  Since

11   that time, AT&T Wireless has gone through a number of corporate

12   gyrations that I am not intimately familiar with.  AT&T was

13   acquired by Cingular, and then as I understand it Cingular was

14   acquired by another AT&T entity, maybe AT&T parent or AT&T

15   Mobile Communications.

16           THE COURT:  Is Cingular a subsidiary of AT&T?

17           MR. BERMAN:  Cingular as I understand was the parent

18   at least for some time of AT&T Wireless Solutions, but I'm not

19   familiar with every one of the twists and turns that has

20   happened in terms of the mergers and acquisitions over the past

21   decade.

22           The reason I raise that for the Court, however, is

23   that we wish it were as simple as picking up the phone and

24   calling AT&T and saying to whoever the contact is there,

25   listen, we've been sued in a putative class action in federal

DC33BERC

1    court in the Southern District of New York, and we need copies

2    of the terms and conditions that were in effect during the

3    period of time during which the specific four named plaintiffs

4    open their accounts.

5            In fact, we tried that.  Our client did reach out to

6    AT&T, but the business contact that our client had nearly 10

7    years ago was no longer with the company.  And the Court

8    probably won't be shocked to find out when we reached out to

9    AT&T and we sort of said, hey, we need these documents, their

10   response was little more than a wave of the hand.  Sorry.

11   We're not a party to this action.  This problem is not our

12   problem; it's your problem.  You haven't served us with a

13   subpoena.  We're not under any kind of order of the court to

14   provide with you these documents.  So AT&T essentially said you

15   want documents, subpoena us.

16           Now, I'll address the difficulty with that or why we

17   haven't done that to date in a moment.  But let me first make

18   the point, I think this is really the key point here.  Is that

19   what we have done by way of substitute, and it is an imperfect

20   substitute and there is no getting around that, is we have gone

21   through the public records, and we have found sworn statements,

22   four of them, and they were attached to our moving papers.

23   They were Exhibits A through D of the letter or affidavit from

24   AT&T Wireless representatives in which they swore under oath

25   the following:  Every AT&T Wireless customer agreement from

DC33BERC

1    1999 and onwards contained an arbitration provision.

2            Now, the plaintiffs have made a great deal of hay in

3    their papers about the fact that those arbitration provisions

4    contain some minor variances.  Whether the customer splits the

5    fees, whether AT&T bears the fee, these kind of things.  There

6    is one main aspect, or I should say two main aspects about

7    which there is no variation and there is no real factual doubt,

8    and that's the following.  Every one of the agreements from

9    1999 onwards, customer agreements from AT&T Wireless to their

10   customers, contains an arbitration provision.  Every one of

11   those arbitration provisions requires arbitration on an

12   individual and not a class basis.  And every one of those

13   arbitration provisions says unless the dispute -- or unless a

14   dispute -- and this is critical, relates solely, solely, to the

15   collection of a debt the customer owes to AT&T, the dispute

16   must be arbitrated.

17           Now the plaintiffs, your Honor, in their papers, have

18   taken the position, and I expect they'll stand up and take the

19   position today, first they'll say, well, these representative

20   agreements, and they said in their papers, are not competent

21   evidence.  They are not competent evidence to establish that

22   AT&T ever had the right to compel arbitration with these

23   plaintiffs.  But that is a profoundly academic argument.  And

24   especially I should say in the face of the FAA --

25           THE COURT:  Isn't academic what the law is all about?

DC33BERC

1            MR. BERMAN:  That's a question that certainly I'm not

2       competent to answer without extensive preparation.

3            But what I would say is the following.  The fact that

4       the AT&T account agreements contained an arbitration provision

5       and the exception was for cases that relate solely to the

6       collection of a debt is not sincerely in dispute.

7            And respectfully, with even a minimum of discovery,

8       Judge Patterson, we believe that we'll be able in relatively

9       short order to establish that to the Court's satisfaction.

10           In other words, you might think you've had a couple of

11      months on this motion, why didn't you serve a subpoena on AT&T.

12      That's a can of worms.  If we start serving third-party

13      discovery, or any discovery, suddenly there is a major issue

14      relating to waiver.  Have we waived our right to fight class

15      certification.  And we think there are profound, profound

16      problems with class certification.

17           Just by way of preview, some of the named plaintiffs

18      claim to be victims of identity theft.  Others sort of loudly

19      don't dispute that they once did have an account with AT&T but

20      they claim that service was improper.  And there are all kinds

21      of highly individual identified issues that really splinter

22      this fractious class.

23           THE COURT:  That's for later.

24           MR. BERMAN:  I understand.  With the Court's approval,

25      and if it were acknowledged on the record, that a narrow

DC33BERC

1    subpoena from us to AT&T that would allow us in due course and

2    short order, to obtain the specific account agreements that

3    were in force when these specific named plaintiffs opened their

4    account, this whole issue would be wiped off the table.  And

5    again, we can and will do that, only to the extent that we are

6    permitted by the Court to do so without waiving defenses as to

7    the larger issues, we perceive to be the larger issues of class

8    certification.

9         In other words, we don't want to start out on this

10   road of discovery only to be whipsawed and told in order to

11   establish your right to arbitration to the Court's

12   satisfaction, what you've done unwittingly is submit to the

13   Court's jurisdiction, waive argument as to class certification.

14   So, the comment I make on that point is I can't imagine what

15   prejudice --

16        THE COURT:  What authority are you relying on for this

17   argument?

18        MR. BERMAN:  Sorry?

19        THE COURT:  What authority are you relying on for this

20   argument?

21        MR. BERMAN:  If I can just have a moment to grab my

22   papers.  We have multiple copies of each.  But the two

23   precedents that I would tender to the court are both Second

24   Circuit precedents.  And they are somewhat anomalous, because

25   ultimately the right to compel arbitration in both cases was

DC33BERC

1   denied.  But only, only after limited discovery of the kind

2   that we're requesting here, respectfully, was granted.

3           The first one I would cite is James Dreyfuss v.

4   Etelecare Global Solutions.  Maybe I ought to simply read the

5   citation to the reporter.  That's at 349 Fed.Appx.

6           THE COURT:  I have it in front of me.

7           MR. BERMAN:  Okay.  And the other case, again, I am

8   not entirely certain how to pronounce this, is Christopher

9   Specht is the first one of the purported class plaintiffs.  And

10  that's against Netscape and what was then known as America

11  Online, now AOL.  And that's 306 F.3d, 17.

12          THE COURT:  What part of the cases are you relying on

13  for your statements?

14          MR. BERMAN:  TGS which was the defendant -- TGS is the

15  acronym, filed the motion to compel arbitration.  There was a

16  problem that came to light immediately, just as the kind of

17  technical problem that came to light immediately here.  In that

18  case, the employment agreement that purportedly contained the

19  arbitration clause that was tendered in motion to support the

20  arbitration, the Court doesn't describe why, but it was

21  apparent it wasn't the original.  Ultimately the Court

22  permitted some discovery to allow TGS to try to obtain the

23  original employment agreement so that it could further

24  substantiate its claim to arbitrability.

25          Frankly, that's militated by the policy concerns that

DC33BERC

 1    underlie the Arbitration Act.  The notion is that it would be a

 2    vital right for us to waive or for the Court to deprive my

 3    clients of without even the right to obtain some narrow

 4    discovery.

 5             THE COURT:  Of whom?

 6             MR. BERMAN:  Sorry?

 7             THE COURT:  Of whom?

 8             MR. BERMAN:  Of AT&T or whatever the correct corporate

 9    name is now.  But I'll call it AT&T.  With respect to Viruet

10    and Roberts.  And with respect to all of them.

11             THE COURT:  How does this show that you are on the

12    horns of a dilemma?  Those are my words, not yours.

13             MR. BERMAN:  I think I understand what you are asking,

14    Judge.  We won't be on the horns of a dilemma going forward.

15             THE COURT:  Why are you now?

16             MR. BERMAN:  We were concerned when we served

17    discovery -- so which is what I tried to articulate probably

18    inexpertly earlier.  We are concerned if we went ahead and

19    sought discovery by means of a subpoena to AT&T, even a narrow

20    subpoena, we would have submitted to this court's jurisdiction.

21    This subpoena power emanates from the court.  And there is

22    authority apparently --

23             THE COURT:  You filed a notice of appearance.  Didn't

24    you submit to the court's jurisdiction?

25             MR. BERMAN:  I believe that merely showing up to argue

DC33BERC

```
 1   the motion to compel arbitration is not deemed to be a waiver
 2   of the right to arbitrate.  By contrast, the concern was and
 3   the concern could be alleviated immediately by you, Judge
 4   Patterson, or even by agreement --
 5           THE COURT:  I haven't heard this in the motion papers.
 6   Have I?  I haven't seen it.
 7           MR. BERMAN:  I don't know that the broader explanation
 8   of this background was set forth in full in the motion papers.
 9   What I wanted to do is take this opportunity to explain to the
10   Court why, as a practical matter, it is not as easy as someone
11   might think to just get the right copy of the terms and
12   conditions and tender it in support of our motion to compel
13   arbitration.
14           THE COURT:  You haven't given me any law.
15           MR. BERMAN:  Respectfully, I am not sure I think
16   that's the case.  I think the Dreyfuss case stands for the
17   principle that the Second Circuit, especially in view of the
18   policy considerations of the FAA, strongly favors at least
19   limited discovery.
20           THE COURT:  What part of it are you relying on?
21           MR. BERMAN:  I guess I would say the end of page five
22   and the beginning of page six, there is the following quote:
23   This is not the law, it is true when considering the question
24   of whether a particular dispute -- I don't know that the Court
25   wants me to read this out loud.
```

DC33BERC

1          THE COURT:  I've gotten where you are.  What are you

2    relying on?

3          MR. BERMAN:  Well, I am not sure how to articulate

4    it --

5          THE COURT:  Citing <u>Moses H. Cone Memorial Hospital v.</u>

6    <u>Mercury</u>, a well-known case.

7          MR. BERMAN:  Those cases are broader.  Obviously those

8    cases support --

9          THE COURT:  I don't see where it givens me this horns

10   of dilemma problem that you're suggesting.

11         MR. BERMAN:  Maybe, let me try this again.  What I'm

12   not saying -- I'm not saying that we are on the horns of a

13   dilemma.

14         THE COURT:  But you were on the horns of a dilemma is

15   what you are saying.

16         MR. BERMAN:  In other words, you want a case that

17   explains -- I think I understand the question now.  I would

18   have to submit that by way of follow up.

19         In other words, you want a precedent that says were we

20   to have attempted to take third-party discovery by means of a

21   subpoena on AT&T, that would have been deemed a waiver of the

22   right to arbitrate.

23         THE COURT:  Yes.

24         MR. BERMAN:  Do we have that with us?

25         MS. LEDERER:  We don't.

DC33BERC

1          MR. BERMAN:  I'm happy within 24 hours to file a

2     supplemental.

3          THE COURT:  If you are relying on that, you should

4     have it here.

5          MR. BERMAN:  Okay.  So, in all events, Judge, on that

6     particular issue I would conclude with the simple point that no

7     one would be prejudiced by a very, very brief, narrow, limited

8     discovery period that would allow us to get the specific terms

9     and conditions.  And it seems to be the appropriate thing to

10     do, in view of the FAA's strong policy favoring arbitration.

11          Now, let me just address a couple of the other

12     arguments that the named plaintiffs raised in their papers in

13     opposition to our motion.  The first one, it is a little bit

14     tricky to respond to, the first one is we haven't established

15     for the Court that the Asta defendants were really the

16     assignees of AT&T.

17          So, obviously, our position is that as the assignee of

18     the charged off accounts, we stand in the shoes of the

19     assignor, which is to say AT&T, and we hold all of their rights

20     and privileges under the relevant agreements.

21          I have to say at the outset, I think the argument that

22     we haven't established that we are the true assignee is

23     disingenuous almost in the extreme.  And I say that because

24     this entire case is predicated on the inflammatory allegation

25     that our client's business model -- this part is not

DC33BERC

```
 1   inflammatory -- that our client's business model is to go out
 2   and purchase tranches of debt from AT&T, and that's in fact
 3   what we did.
 4              THE COURT:  That doesn't mean you are assigned.
 5              MR. BERMAN:  We did do that.
 6              THE COURT:  That doesn't mean they were assigned.
 7              MR. BERMAN:  No, so --
 8              THE COURT:  Which any corporate lawyer, and I
 9   practiced corporate law as well as litigation, would have it
10   right in the contract that it is an assignment as well as a
11   purchase and sale, and you assign the accounts pursuant to a
12   purchase and sale, and it would be right in the agreement.  So,
13   you should have it.
14              MR. BERMAN:  It is.
15              THE COURT:  What you've got is a lot of companies that
16   have sprung up and they have a variety of counsel and they are
17   not as careful as we used to be.  Or as your firm and my firm
18   and all the firms assembled here.
19              MR. BERMAN:  Judge Patterson, we did tender that.
20   That is the first exhibit to the affidavit of Seth Berman,
21   which was appended to our moving papers.  There is a master
22   purchase and sale agreement.
23              THE COURT:  That's what I'd like to see.
24              MR. BERMAN:  I should say it is coupled with the sworn
25   statement in the covering affidavit that Palisades is the
```

DC33BERC

1    assignee of AT&T Wireless.  It is right on page two, your

2    Honor.  In paragraph 2.1 of the agreement.  It says agreement

3    to purchase.  Subject to terms of this agreement, on closing

4    date AWS, that's AT&T Wireless, agrees to sell and assign.

5            THE COURT:  That's a long ways from getting to the

6    chain of title or assignment.  There are other parties in here,

7    right?  Besides Wireless and your client.

8            MR. BERMAN:  No, this is it.  This is the purchase and

9    sale agreement is directly between Palisades Collection, which

10   is one of the Asta defendants.

11           THE COURT:  Oh.

12           MR. BERMAN:  And AT&T Wireless.

13           THE COURT:  Yes.  But then weren't there further

14   assignments?

15           MR. BERMAN:  No.

16           THE COURT:  Asta Funding wasn't involved?

17           MR. BERMAN:  No.  So Asta Funding is the parent of

18   Palisades Collection.  There is a separate argument, by the

19   way, that the plaintiffs have made with respect to the parent.

20   What they say is even if the Court deems -- and I respectfully

21   submit that the Court ought to deem -- that Palisades is the

22   valid assignee and it's been established to the Court's

23   satisfaction of AT&T Wireless rights, the defendants haven't

24   shown that the parent can avail itself of the arbitration

25   right.

DC33BERC

1          Now, there is a very common sense response to that,

2     and I would tender it to the Court as follows.  This is a

3     complaint that accuses my clients, meaning Palisades, the

4     individual CEO, and Asta, of being a RICO enterprise.  An

5     entity that operates seamlessly, one and the same, for purposes

6     of the Fair Debt Collection Practices Act, for purposes of the

7     guillotine under RICO.  But of course, when it comes to

8     availing ourselves of the right to arbitration that's in the

9     agreement, we are a whole bunch of separate entities.  That's

10    just inconsistent.

11          THE COURT:  Okay.  Let's move on then.

12          MR. BERMAN:  Okay.  Just one related thing I want to

13    address sort of anticipate for the Court.  I think you are

14    going to hear when the plaintiffs argue is all you see is a

15    master purchase and sale agreement.  You don't have a bill of

16    sale for each of the individual named plaintiffs.  I just want

17    to clarify for the Court that when tranches of debt of this

18    magnitude are bought, or sold and bought, this is the means by

19    which those transactions are effectuated.

20          It may be, and I don't want to over assume, but it may

21    be that the plaintiffs and their counsel are used to seeing

22    more streamlined debt collection actions in which an ordinary

23    cause of action for accounts stated or something like this in

24    state court is supported by nothing more than the bill of sale.

25    But when our clients contract with AT&T to purchase these large

DC33BERC

 1    tranches of debt, the way it was effectuated was by means of a

 2    master agreement.  So I want the Court to be aware of that.

 3            The next argument that the plaintiffs made in their

 4    papers is that even if the Court accepts the sort of sample

 5    agreements, AT&T Wireless agreements that we've tendered, and

 6    even if the Court believes that the Asta defendants' group are

 7    proper assignees, there is an exception in the arbitration

 8    agreement for actions that relate to the collection of debt.

 9    So if you're AT&T and you want to go collect a debt, you can do

10    it in court.  But there is a glaring omission.  The language in

11    every single one of the AT&T customer agreements that we've

12    tendered to the Court as exhibits to the letter affidavit, and

13    I would represent if we're able to get the specific agreement

14    that was in force at AT&T pursuant to some limited discovery,

15    every one of them says that the exception applies to actions

16    solely related to the collection of debt.  And that word, the

17    importance of that word, I should say, just can't be

18    overstated.

19            To call this an action, the present putative class

20    action which seeks relief under the FDCPA, which seeks relief

21    under New York General Business Law 349, which seeks relief

22    under the RICO, which seeks relief under judiciary law, to say

23    this is an action related solely to the collection of debt is

24    just inconsistent with the plain language of the exception to

25    the arbitration provision.

DC33BERC

1          The authority there is when a contract is crystal

2     clear on its face, the Court will give meaning to the natural,

3     give effect to the natural meaning of the words.

4          I think we talked about discovery.  One of the

5     plaintiffs' concerns or arguments was we haven't served

6     discovery or identified specifically what discovery we would

7     take.  I'll touch on that just very briefly because I think we

8     spoke about it.  Two of the named plaintiffs, Brito and

9     Bernhart, deny they ever had accounts with AT&T Wireless.

10          THE COURT:  I thought they were Viruet and Roberts.

11          MR. BERMAN:  Those two sort of loudly don't deny it.

12     The other two, Bernhart and Brito, say, hey, we were the

13     victims of identity theft.

14          THE COURT:  I do remember that.

15          MR. BERMAN:  In the exercise of zealous advocacy, I

16     feel compelled to point out that all this tells us or what this

17     tells us principally is the incredibly fractious nature of this

18     purported class.  It is not an accident, of course, that the

19     class is defined as everyone who was sued or may be sued by the

20     Pressler law firm, which I understand is not like saying

21     everyone who is sued or may be sued by the Hughes Hubbard firm

22     or something like this.  It is a different business model and I

23     get that.

24          It is nevertheless, I would submit, a very problematic

25     definition of a putative class.  With respect to Bernhart and

DC33BERC

1    Brito, they claim that they were the victims of identity theft.

2    Now, I should add there were state court judgments entered

3    against them, Bernhart and Brito.  Those state court judgments

4    were vacated.  But the opinions vacating the state court

5    judgments say nothing whatsoever about the issue of identity

6    theft.

7            THE COURT:  They were vacated?

8            MR. BERMAN:  They were vacated.  But so far as we can

9    tell, the basis for vacatur had to do with the effectiveness of

10   service.  And it is one of these two line -- you can't tell

11   from the face of the opinion.

12           So, what we would want, look, if they were victims of

13   identity theft, first of all, that's not necessarily an issue

14   that Asta is on the hook for.  They may or may not be.  But,

15   the question, the facts pertaining to whether Brito and

16   Bernhart were in fact victims as they claim of identity theft,

17   that's within their possession.  The information related, we

18   couldn't possibly have that information.  So it wouldn't even

19   be in AT&T's possession presumably.  Maybe a complaint was

20   lodged, maybe the police department.  But I don't think we need

21   to do anything that far reaching.

22           What we would want with respect to Viruet and Roberts,

23   essentially we want the right to serve a subpoena on AT&T that

24   says please provide us with the specific account agreement that

25   was in force during the time period of these two accounts.  And

DC33BERC

1     then with respect to Bernhart and Brito, we would want the

2     right to take discovery from them on the issue, and only on the

3     issue, of the claimed identity theft.  And we'll see how that

4     shakes out.

5          As an interesting corollary of that, in the

6     plaintiffs' papers, and these are arguments in the alternative,

7     even if you buy everything that the Asta defendants say, what

8     you ought to do, your Honor, is you ought to stay the case as

9     to Brito -- I'm sorry.  Ought to -- my mistake.  You ought

10    to -- if you are inclined to order arbitration with respect to

11    Viruet and Roberts, that's fine, but the case shouldn't be

12    stayed as to Bernhart and Brito, it ought to proceed.

13         Now, first of all, I would submit that's almost

14    tantamount to an acknowledgment of the degree of fractiousness

15    in the purported class.  Now we have a class of people who were

16    AT&T account holders, it's established to the Court's

17    satisfaction, that's going forward in arbitration.  Then we

18    have another class of people who were purported victims of

19    identity theft and whose wages were nevertheless garnished and

20    wrongfully subject under the FDCPA, under the RICO, proceeding

21    in federal court.

22         That's a waste of the court's resources and it is sort

23    of contrary to common sense to certify a class and look, I

24    know --

25         THE COURT:  I'm not on that argument yet.  You're

DC33BERC

1    moving on to something else.

2           MR. BERMAN:  All right.  So for better or worse, it

3    was in the papers.  I wanted to highlight it for the Court's

4    attention.  That's really it, unless the Court wants to hear a

5    few words about the Rooker-Feldman argument that found its way

6    into the same papers.  Rooker-Feldman is this --

7           THE COURT:  I know.

8           MR. BERMAN:  So, Mr. Viruet sought in the state courts

9    to have his convictions vacated.  And the court denied those

10   motions.  Finished.  Right.  The Social Security numbers were

11   matched up, the Ts were crossed, the Is were dotted to the

12   state court's satisfaction.

13          In effect, in practical effect, as to that named

14   plaintiff, as to Mr. Viruet, this action is an attempt, no

15   matter how you skin the cat, to undermine or to in effect

16   reverse the state court judgment.

17          So, you will hear from the plaintiffs about why they

18   disagree with that.  We see no way around it.  It didn't escape

19   our attention that the complaint was actually amended to add

20   Mr. Viruet as a plaintiff at some point in the process.  The

21   argument on Rooker-Feldman relates only to that individual

22   named plaintiff, and the argument is really that

23   straightforward.  There is no way around the reality that the

24   claims here -- by the way, it is not like you see a prayer for

25   relief where they say we want relief on behalf of Mr. Viruet

DC33BERC

1    but we expressly carve out the judgment against him in state

2    court.  They don't carve it out.  They want that money back.

3         So the conclusion is really inescapable from our

4    standpoint that Rooker-Feldman would preclude the matter from

5    proceeding with Mr. Viruet as a named plaintiff.

6         If I can have a minute to look over my notes, I think

7    those are the only items I wanted to bring to the Court's

8    attention at the outset.  One last thing.  I can raise it if

9    the Court is going to give me an opportunity to be heard again.

10        THE COURT:  You'll have a reply.

11        MR. BERMAN:  Then that's all for now.  Thank you, your

12   Honor.

13        MS. TARANTOLO:  Good afternoon, your Honor.  Again, my

14   name is Danielle Tarantolo, I am an attorney at the New York

15   Legal Assistance Group appearing on behalf of the plaintiffs.

16        Your Honor, Mr. Berman has just now before the Court

17   conceded that he agrees with the plaintiffs that they have not

18   provided the contracts that they claim bind these individuals

19   against whom they've moved, Mr. Roberts and Mr. Viruet, to

20   arbitrate these claims.  We think that that ends the inquiry.

21        All of the rest of this talk about how other people

22   had entered contracts, the manner in which they entered those

23   contracts, what contracts those other people entered, none of

24   it is relevant here.

25        Arbitration is a matter of contract, and it is their

DC33BERC

```
1    burden to establish that these individuals, not other
2    individuals, entered agreements to arbitrate.  And they haven't
3    done that.
4           Instead of introducing these contracts, they have
5    asked the Court and here asked the Court essentially to infer
6    that these individuals may have waived their rights to litigate
7    in court on the basis of other four other people's agreements
8    to arbitrate that were produced in other cases.  And they
9    simply can't do that.
10          Mr. Berman relied on the fact and the defendants'
11   papers rely on the fact that all of the sample agreements that
12   they did provide that purportedly govern these other people's
13   accounts --
14          THE COURT:  Are you answering arguments here or are
15   you going to go further and answer in more detail with
16   citations to cases?
17          MS. TARANTOLO:  Your Honor, whatever the Court would
18   prefer.
19          THE COURT:  I don't prefer either one, I just want to
20   know, because I would expect citations to the cases you are
21   relying on in oral argument.
22          MS. TARANTOLO:  Understood, your Honor.  For the
23   proposition that the party moving to compel arbitration has to
24   produce, identify the contract that purportedly binds the party
25   to arbitrate, there are hundreds of citations.  That is very
```

DC33BERC

```
 1    clearly the law on arbitration.

 2            With respect to the specific issue, however, of

 3    whether these differences among the arbitration agreements --

 4    let me back up.

 5            They are essentially arguing it is immaterial that the

 6    sample agreements that they've provided that other people

 7    entered differed from one another.  We think that's absolutely

 8    not the case.  The Opals On Ice case that we cite in our brief,

 9    for which I can provide the citation.  That is --

10            THE COURT:  I am aware of the case.

11            MS. TARANTOLO:  You have it, your Honor?

12            THE COURT:  Yes, I do.

13            MS. TARANTOLO:  In that case, unlike here, there were

14    actually signed documents that evidenced the parties' intention

15    to arbitrate.  The problem there was that one party had signed

16    a version of the arbitration agreement that specified

17    arbitration in New York, and the other party signed a version

18    of the arbitration agreement that specified arbitration in

19    California.  In that case, even though they did actually

20    produce contracts signed by both parties, the court held that

21    wasn't enough, because there has to be a meeting of the minds

22    to establish a contract to arbitrate.  Not just on the abstract

23    concept of arbitration, but on the specific procedures that

24    would govern arbitration.

25            I'd like to turn for one moment to what Mr. Berman
```

DC33BERC

1    explained by way of factual background for the Court in terms

2    of how parties supposedly enter contracts like these, these

3    cellular phone contracts that supposedly contain the

4    arbitration agreements.

5            As Mr. Berman explained, and we don't dispute that

6    this is not a situation where we are demanding they produce a

7    signed contract that was signed by these individuals.  We

8    understand that's not the manner in which they are contending

9    that contracts like this are formed.

10           What they have described in the other declarations

11   that relate to the other AT&T Wireless customers is a process

12   by which individuals sign up for phone service, and then they

13   receive a phone, and in the box with the phone is a little

14   booklet, and in the booklet is, among many, many other things,

15   a provision mandating arbitration.

16           They haven't even contended, represented, much less

17   established by any evidence, that that's what happened with

18   respect to these individuals.  They've said nothing whatsoever

19   about the manner in which these individuals supposedly entered

20   any contracts.  But they are clearly suggesting to the Court,

21   and even if they were relying on the idea that our clients may

22   have entered contracts in this same manner, the receipt of a

23   booklet in a box, they can't do that here.  Because with

24   respect to these specific individuals, they have already

25   represented in sworn statements made to the state court in the

DC33BERC

1    collection actions that related to Mr. Roberts and Mr. Viruet,

2    that those individuals received any governing terms and

3    conditions in the mail.  And they can't now come before this

4    Court and claim a different method of notification of the

5    contract terms than what they have already asserted in this

6    earlier judicial proceeding.

7              THE COURT:  Are you saying that the telephones they

8    were supplied with and the box and all were not sent through

9    the mail?

10             MS. TARANTOLO:  Well, what Mr. Berman has just

11   represented is the individual goes to the store and purchases

12   the box.  In any event, it hardly matters, because they haven't

13   actually said what way they think that our clients received any

14   contracts.  This, your Honor, is a totally separate deficiency

15   from failing to actually identify the terms of the contract,

16   each of which is fatal to the motion.

17             We understand that the law has evolved, and I don't

18   always need to have a signed contract between two parties to

19   show that an agreement to arbitrate was formed.  Sometimes

20   contracts can be formed in a more passive process like the one

21   they described.

22             We think that the process described in these other

23   declarations strains the boundaries of what's permissible, and

24   should they ever actually represent with evidence that that's

25   what happened here, we can talk about that then.

DC33BERC

1          THE COURT:  That would be after purchase, wouldn't it?

2          MS. TARANTOLO:  I'm sorry?

3          THE COURT:  Then the terms would be received after

4    purchase under that system?

5          MS. TARANTOLO:  Yes, that's my understanding.  And

6    there are circumstances in which contracts can be formed in

7    that manner.  But, the Second Circuit as well as many, many

8    other courts, including in the Specht v. Netscape case that

9    Mr. Berman just cited for the Court, have been very clear that

10   is a process that is amorphous and it is subject to abuse.  As

11   a result, it is very important that the party attempting to

12   meet its burden to establish an agreement to arbitrate has to

13   be very specific about the manner in which the individual who

14   supposedly entered the contract was notified or put on notice

15   of the terms of the contract and then subsequently assented to

16   the terms of the contract.

17          And our point is that this -- Mr. Berman maybe would

18   describe this as academic -- it is a hard and fast rule.  You

19   have to show a meeting of the minds on the agreement to

20   arbitrate.  And our point is that they have offered nothing

21   here to the Court at all, whatsoever, with respect to how these

22   individuals entered a contract.  And that in fact, anything

23   that they could say that would establish a parallel process to

24   what was described with respect to these other individuals in

25   the other court cases is not one that they could rely on here,

DC33BERC

1   because it contradicts their earlier representation.

2           THE COURT:  Is there any particular cases that you are

3   relying on, on this?

4           MS. TARANTOLO:  Yes, your Honor.  With respect to

5   notification and assent, there is the Hines v. Overstock case

6   which we cite in our brief.  I can give the Court the citation.

7           THE COURT:  I have it.

8           MS. TARANTOLO:  You have that one?  And the Schnabel

9   v. Trilegiant case, also cited in our papers, 697 F.3d 110 (2d.

10  Cir. 2012).  Schnabel, if I recall, does not rely on New York

11  contract law.  But it is the same principle that I don't think

12  that anyone could dispute that all states contract laws require

13  you to show that a contract actually was formed before you can

14  enforce any rights that ostensibly are in the contract.

15          If your Honor has no more questions on that particular

16  issue, I'd like to turn to this question of discovery.  And

17  defendants have now stated that they would like to take

18  discovery both from AT&T and also from Mr. Brito and

19  Ms. Bernhart, the other two named plaintiffs against whom they

20  haven't yet moved.

21          If they want to take discovery from all of these

22  parties, we say fine.  Let's move on and have merits discovery

23  in this case now.  They've had their opportunity to make their

24  motion.  They made it.  They could have requested discovery in

25  advance of making what we believe is the deficient motion that

DC33BERC

1    they have made with respect to the two plaintiffs against whom

2    they have moved, and they didn't make that request.  Instead,

3    they gave it a shot and they have put forth what we believe are

4    woefully insufficient papers in support of that motion.  We

5    think that motion should be denied now and we should move on

6    with this case.  They can take discovery from AT&T as well as

7    from our client.  We'll take discovery from them.  And if they

8    want to later make a motion that they believe they might be

9    able to cure some or all I guess of the many deficiencies in

10   their current motion, they can make it later.

11           THE COURT:  Discovery would be in connection with a

12   class action motion?

13           MS. TARANTOLO:  We would like to have a scheduling

14   conference with the Court as soon as possible to set forth the

15   discovery schedule.  We haven't yet discussed with defendants

16   whether it would make sense to bifurcate discovery or do

17   discovery all together.

18           THE COURT:  You agree it would cover the class action

19   motion also?

20           MS. TARANTOLO:  Discovery would eventually certainly,

21   yes, at some point.

22           THE COURT:  Prior to the class action determination.

23           MS. TARANTOLO:  Yes, your Honor.  We would want to

24   take discovery before.

25           THE COURT:  Or putative class action.

DC33BERC

1          MS. TARANTOLO:  Correct.

2          To move now to a moment to the issue of the assignment

3    of these accounts.  We are agreed the purchase and sale

4    agreement that defendants have provided says what it says.  It

5    says that some accounts are being transferred from AT&T

6    Wireless to Palisades.  It also says that any specific transfer

7    from AT&T to Palisades under the terms of that master agreement

8    will be documented by a bill of sale.  That is the document

9    that actually establishes the chain of title to the account.

10   And defendants' original submissions included one bill of sale

11   only, and they have admitted it is not in fact the bill of sale

12   even they purport to have transferred these particular

13   individuals' accounts.

14         THE COURT:  Which particular?

15         MS. TARANTOLO:  The accounts in the names of

16   Mr. Viruet and Mr. Roberts.  Again I suspect that -- Mr. Berman

17   claims that the other Berman -- the other Mr. Berman, Seth

18   Berman, the general counsel of Palisades, he stated in his

19   affidavit that these particular Viruet and Roberts accounts

20   were transferred.  That's clearly not enough, that's a best

21   evidence problem.  They need to show the actual bill of sale,

22   and they didn't do that in connection with their motions.

23         Even in their reply submissions, which the Court has

24   we think properly agreed to disregard, they provided other

25   bills of sale.  But still nothing that links those bills of

DC33BERC

1      sale to these accounts.  And we understand that these are

2      transactions that occur in bulk.  We also understand that

3      Palisades and Asta make purchases like this at substantial

4      discounts, and they don't always get all of the paperwork that

5      exists with an account.  Frankly, that's a risk that they take

6      on when they take the transactions.  It simply it is not

7      academic.  It doesn't absolve them of the responsibility to

8      establish that they are the assignees of this account.

9              So in that sense, I agree that this question of

10     assignment -- I agree with Mr. Berman that the question of

11     assignment in some ways does go to the heart of this case.

12     Because the heart of this case is that they litigate against

13     individuals like our clients without having the proper

14     documentation.  And that's precisely what they've done here

15     when they have moved this Court to compel arbitration without

16     having the right documents.

17             And as your Honor observed, the law is academic.  You

18     do have to make those showings.  That's what the requirements

19     are there for.

20             To turn for a moment very briefly to the issue of

21     estoppel which goes to Mr. Berman's point that those of their

22     clients who were not assignees should not be able to enforce

23     the agreement of the assignees by virtue of their relationship.

24     Let me say that again.

25             The estoppel concept goes to the question of under

DC33BERC

what circumstances a non-signatory to an agreement or a
non-party to an agreement, such as these defendants, can
enforce an agreement entered by another party.

          The one point I want to make is that Mr. Berman in his
argument now and in the defendants' papers focused on the
allegations of coordinated conduct in the complaint.  We
disagree with their characterization of the complaint.  But in
any event, that's only one of the elements they would have to
show.  They also have to show that the subject of this dispute
is intertwined with the subject of the agreement that contained
the arbitration clause.  That was an agreement for cellular
phone service.  This is a lawsuit about improper debt
collection practices.

          For some, but not all of our class members, that may
have been but for cause of the parties of their eventually
getting sued, but that's not the same as showing that the
dispute is intertwined with the relationship.

          One final point, your Honor, with respect to the
exclusionary clause.  The law is clear that an arbitration
contract should be interpreted just like any other contract.
And it is the Court's responsibility to give effect not only to
the parties' agreement, to send certain disputes to
arbitration, but also their agreement to hold back certain
disputes from arbitration.

          The exclusionary clause that we're discussing, I'll

DC33BERC

1    just read it very briefly, it's very short, it says:  "You or

2    we may choose to pursue claims in court if the claims relate

3    solely to the collection of any debts you owe to us or that the

4    customer owes to AT&T."

5           These claims relate only to debt collection.

6    Palisades is a company that acquires debts only to collect on

7    them.  There is no other aspect of the customer relationship

8    between a customer and AT&T that is remotely implicated by this

9    case.  They would prefer, apparently, that the clause read

10   "we," not "we or you," but "we may choose to pursue claims in

11   court if those claims are for the collection of a debt."

12   Rather than "relate to the collection of a debt."  And

13   unfortunately for them, that's simply not what the clause says.

14   This Court has to give meaning to the words of the clause, and

15   the words of the exclusionary clause encompass this dispute.

16          If your Honor were to deny the motion to compel as

17   against Mr. Viruet, your Honor would have to reach the

18   Rooker-Feldman issue, so I just want to say a few very brief

19   words about the motion to dismiss on Rooker-Feldman grounds.

20          The Supreme Court has pared down the Rooker-Feldman

21   doctrine to its very core.  This was in the Exxon Mobil case in

22   2005.  It covers only cases in which a plaintiff goes to

23   federal court and seeks what is in substance appellate review

24   of the state court decision.

25          That is not what we are asking the Court to do here.

DC33BERC

We are not seeking to vacate or overturn the judgment in the
state court.  Our prayer for relief nowhere says that's the
relief we are seeking.

What we're seeking is compensatory damages.  It is not
the same thing, and the Supreme Court and Second Circuit has
made clear that the question is whether the judgment will be
left on the books.  And here, even if we get all the relief we
are seeking, the judgment would be left on the books.

It is also distinguished by the fact that we are not
seeking to have this -- appellate review asks whether a state
court got something wrong on the record before it or made a
mistake or legal error.  That would be harm that's imposed by
the state court judgment.  That's not the harm that we are
asking the Court to examine here.  We are asking the Court to
look at the harm caused to our clients, to these named
plaintiffs, by the litigation misconduct or alleged litigation
misconduct of these defendants.  That's a separate question.

I think there are a number of cases, I could give the
citations if the Court wants, but many of them are in our
brief.  Many, many courts have examined the application of the
doctrine in cases very similar to these, where individuals
sought compensatory damages in federal court that were related
to but didn't seek to overturn a state court judgment.  And
those courts conclude that the doctrine doesn't apply here.

Unless your Honor has any other questions, that will

DC33BERC

1    conclude what I have to say.  Thank you, your Honor.

2             THE COURT:  Mr. Berman.

3             MR. BERMAN:  Thank you.  Thank you, Judge Patterson.

4    I've made myself a list numbered one through six.  So hopefully

5    I can make each point concisely.

6             The first and by far the most important point I want

7    to make, and we've heard this for the first time in counsel's

8    argument a moment ago, is this notion that the plaintiffs ought

9    to be entitled to take merits discovery now prior to class

10   certification.  That's an extreme position.  It is an extreme

11   position, especially in light of the fact that the class on its

12   face is a fractious class, with highly individualized issues

13   that are brought into relief by the complaint itself.  Some are

14   victims of identity theft; some are not.  Some had accounts

15   with AT&T; others didn't.  Some got their underlying vacated;

16   some didn't get it vacated.  The notion of being forced into

17   extraordinarily expensive full-blown merits discovery prior to

18   class certification in the context of an argument --

19            THE COURT:  They asked for a conference on the

20   discovery.  All I was ascertaining was whether you would be

21   limited in some way in your discovery of the class.  And their

22   response was no.  That's what I understood.

23            MR. BERMAN:  Okay.  That's fair enough.  I just

24   thought it was important enough to bear mention we would

25   vigorously oppose going into full-blown discovery.

DC33BERC

| | |
|---|---|
| 1 | THE COURT:  That's for another day. |
| 2 | MR. BERMAN:  The second point is Ms. Tarantolo said we |
| 3 | have submitted literally nothing.  No evidence, nothing, no |
| 4 | competent evidence.  Sort of a poignant statement.  I just |
| 5 | don't think that's accurate. |
| 6 | I think as a practical matter, we've met the burden, |
| 7 | and the burden is articulated precisely in the <u>Hines v.</u> |
| 8 | <u>Overstock</u> case.  I am going to read it to you.  It is in the |
| 9 | plaintiffs' papers.  It is in their papers.  The burden is that |
| 10 | the movant seeking to compel arbitration -- and here is the |
| 11 | quote -- must make a prima facie showing of entitlement to |
| 12 | arbitration. |
| 13 | I don't think there is any question that we've made a |
| 14 | prima facie showing as a practical matter that an agreement to |
| 15 | arbitrate existed.  By the way, I didn't represent anything.  I |
| 16 | don't know if these particular four named plaintiffs 10 or 12 |
| 17 | years later, whether they went to the store and opened their |
| 18 | account, whether they got their phone and terms and conditions |
| 19 | in the mail.  I don't know. |
| 20 | But I know, and I think the evidence in the public |
| 21 | record is crystal clear, that the terms and conditions of the |
| 22 | AT&T Wireless service agreement contained an agreement to |
| 23 | arbitrate. |
| 24 | I don't want to retread what I said about opportunity |
| 25 | to take limited discovery.  We could prove it even further if |

DC33BERC

1   necessary.  I wanted to highlight to the Court what the showing

2   is that's required.  We don't have to prove by clear and

3   convincing evidence.  We don't have to prove beyond a

4   reasonable doubt.  We have to make a prima facie showing.

5          THE COURT:  What part of Overstock are you referring

6   to?  The difficulty in Overstock's position is the party

7   seeking to invoke the FAA paragraph four must make a prima

8   facie showing that an agreement to arbitrate existed.

9          MR. BERMAN:  That's right.

10          THE COURT:  Before the burden shifts to the party

11   opposing the arbitration.  Making that agreement in issue.

12          MR. BERMAN:  That's exactly the part we are relying

13   on.

14          THE COURT:  All right.  Go ahead.

15          MR. BERMAN:  Look, no question they are saying okay,

16   now we've borne the burden that we've opposed it.  We say none

17   of these contracts bind the individual plaintiffs.  But --

18          THE COURT:  Then you leave out the next part.  It says

19   in the context of the motions to compel arbitration, the court

20   applies a standard similar to that applicable for a motion for

21   summary judgment.

22          MR. BERMAN:  Exactly.  A motion for summary judgment

23   would be improper without any discovery.

24          THE COURT:  A party seeking to invoke FAA paragraph

25   four must make a prima facie initial showing that the agreement

DC33BERC

1      to arbitrate existed before the burden shifts to the party

2      opposing arbitration in the making of that agreement in issue.

3      In the context of motions to compel arbitration, the court

4      applies the standard similar to that applicable for a motion

5      for summary judgment.

6              MR. BERMAN:  Judge Patterson, what we say to that is

7      surely, surely, there is an issue of fact here at a minimum.

8              THE COURT:  You've got to demonstrate that an

9      agreement to arbitrate was made.  That's the next sentence

10     right after the one I just read you.

11             MR. BERMAN:  Here's what is before the Court.  We have

12     sworn testimony from representatives of AT&T.  Sworn testimony.

13     In four cases, every single customer agreement after 1999

14     contained an arbitration provision.

15             THE COURT:  That arbitration provision is worded in a

16     certain way under the contracts.  So-called contracts.

17             MR. BERMAN:  So all we are requesting is the

18     opportunity to -- you send these document requests and they are

19     pages and pages long.  Our document request to AT&T can be one.

20     Can be one request.  "Please provide the customer agreement

21     that was in force between January 2002 and June 2002."

22     Whenever it was that these customers opened their account.

23     Give it to us.  And they unfortunately won't do it without a

24     subpoena.

25             THE COURT:  Okay.

DC33BERC

1          MR. BERMAN:  So that's --

2          THE COURT:  You didn't choose to subpoena them.

3          MR. BERMAN:  Again, I don't want to retread the ground

4    we went over.  Without the Court's imprimatur, engaging in that

5    kind of discovery by subpoena could subject us to the

6    jurisdiction of the court and waive the claim to arbitration.

7    So, we needed to at least get on the record that seeking those

8    documents by means of a subpoena would not amount to a waiver

9    of the right to compel arbitration.

10          THE COURT:  You have no authority for it.

11          MR. BERMAN:  With the Court's permission, we would

12    send it in by the close of business lawyer time today.

13          As to a couple more quick points, I'll get to them

14    quickly.  As to this bill of sale issue, I get to do this

15    because I'm new to the firm, so my name wasn't on those papers,

16    and the Court rejected some additional information that we

17    submitted in connection with the second affirmation of the

18    general counsel of the company.

19          But, respectfully, in light of the argument we're

20    having here today, I would ask the Court, if not formally to

21    reconsider, to see it slightly differently.

22          THE COURT:  It is a motion to dismiss.  But go ahead.

23          MR. BERMAN:  The notion is they sued us, and they said

24    you guys go out and buy debt, you buy these tranches of charged

25    off accounts, you own them, and you engaged in this far-ranging

DC33BERC

1    conspiracy to collect.  To go out and collect them through

2    improper means.  Nobody said at any point we don't think you

3    really own them.  We don't really think you are the proper

4    assignee of these accounts.  It wasn't an issue.

5            It would be anomalous or it would be odd if in our

6    moving papers to start establishing a kind of chronological

7    chain of title.  It is in the complaint.  So, it feels a little

8    bit like being sandbagged.  You get accused of being part of

9    this quasi-criminal conspiracy as a buyer of tranches of

10   charged off accounts.  And then you say, all right, well, as

11   the assignee of these charged off accounts, we have the right

12   to arbitrate.  And they turn around and say, no, ah-ha, we got

13   you, you haven't proven that you really were the assignee.

14           THE COURT:  You haven't really proved you've got an

15   agreement to arbitrate, is the real issue.

16           MR. BERMAN:  I agree.  And I think the only way for us

17   to definitively prove it for the Court, and I think it could be

18   done very quickly with a single one-document request by

19   subpoena to AT&T.

20           THE COURT:  All right.

21           MR. BERMAN:  This notion --

22           THE COURT:  You made that decision.

23           MR. BERMAN:  Yes.  So, this notion, Judge Patterson,

24   with respect to whether an assignee can avail itself as a

25   general matter of the right to arbitrate in the assignor's

DC33BERC

1  contract, Ms. Tarantolo was right.  Simply being an assignee is

2  not enough.  We have to shows the claims in issue are

3  intertwined with the agreement.

4           THE COURT:  She says you need a bill of sale.

5           MR. BERMAN:  The bill of sale, I am afraid I don't

6  understand that.  We have the sworn statement of the general

7  counsel that we acquired these -- we, Asta acquired these

8  accounts.  Nobody is calling that into question.  Nobody is

9  questioning the credibility of that.  Suddenly there is a best

10  evidence problem?  We are not in front of a jury.

11           THE COURT:  Has he got knowledge?

12           MR. BERMAN:  Yeah.

13           THE COURT:  What's his knowledge on -- how many

14  accounts do you have here?

15           MR. BERMAN:  What was the question?

16           THE COURT:  How many accounts did they buy?

17           MR. BERMAN:  In total?  Thousands.  I can see where

18  you are going.  Does he know the names?  Before he signed the

19  affidavit, and my colleague will correct me if I'm wrong, he

20  went through the records of Palisades, the tranches of names --

21  let me be very clear.  We don't only have a master bill of

22  sale.  We also have and have tendered to the Court account

23  statements that have the last four of the Social, they have the

24  address of these individuals, they have the name, and they show

25  usage on the account, phone calls were made to and from.  There

DC33BERC

1   is an amount outstanding.

2        So, when Seth Berman -- and I don't know the man

3   individually, but I'm informed by my colleagues -- when Seth

4   Berman undertook to draft the affidavit, to affix his

5   signature, he reviewed the business documents of his company.

6   He didn't just say, yeah, I know, I remember Viruet and -- he

7   went through the spreadsheets and he matched it up to the date

8   of transaction.  So, there is no real reason to call that sworn

9   statement into question.

10        THE COURT:  And the bill of sale?  He got the bill of

11   sale on all these accounts?

12        MR. BERMAN:  Yes.  We've spoken about this.  This is

13   why we tried to attach the document to the reply, to which, of

14   course, the plaintiffs object and said, no, no, this is new

15   evidence.  And the only thing we can say or I think we tried to

16   say is it was new evidence we introduced in response to the

17   specific argument that we didn't foresee.  We didn't think

18   anyone was going to raise an objection that we were actually

19   the assignee of these accounts.  That's the conceptual

20   predicate of the complaint.  It is the conceptual predicate of

21   this whole class action.  Suddenly they say maybe you weren't

22   really the assignee.

23        THE COURT:  Is it in your reply papers, the bill of

24   sale?

25        MR. BERMAN:  Yes, your Honor.  I'm informed that it

DC33BERC

```
 1   is.  We can resend it or hand it up.

 2              MR. UNIS:  The two relevant bills of sale are attached

 3   to our reply papers, the sworn testimony.

 4              MR. BERMAN:  I'll leave that and move on.

 5              Two final points.  One is with respect to this solely

 6   exception.  You can go to court under these arbitration

 7   agreements if the claim relates solely to the collection of

 8   debts.  We say this is the farthest thing from that.  This is a

 9   RICO, this is an FDCPA action.  This doesn't relate solely to

10   the collection of debts.  Ms. Tarantolo --

11              THE COURT:  That isn't the language of the provision.

12              MR. BERMAN:  Let me grab the language of the

13   provision.  I think it is the language.

14              THE COURT:  Relating to.

15              MR. BERMAN:  Solely related to the collection of

16   debts.  Thank you, Judge.

17              What plaintiffs' counsel did was unintentional kind of

18   sleight of hand, which was the way she rephrased it was this

19   action relates solely to debt collection.  There is a

20   difference there.

21              THE COURT:  That isn't what she said.  That isn't what

22   she said.

23              MR. BERMAN:  Well --

24              THE COURT:  That's what you said when she said you

25   said.
```

DC33BERC

1          MR. BERMAN:  All right.  In all events, our position

2     remains, and instead of trying to rearticulate that chain of

3     "she said I said," which I'll fail at, our position remains

4     this action is the farthest thing from an action that relates

5     solely to the collection of debts or however it is properly

6     phrased.

7          There is ranging relief here.  There are claims under

8     the Racketeering Corrupt Organizations Act.  That this does not

9     relate solely to the collection of debts.

10         Final point on Rooker-Feldman.  The notion is that

11    federal courts don't sit as courts of appeal over state courts.

12    But if this Court were to ultimately issue a ruling in

13    Mr. Viruet's favor, the conclusion or the inference is

14    inescapable that the state court was wrong.

15         THE COURT:  It doesn't review those issues.  That

16    wasn't the issues before it.

17         MR. BERMAN:  That's --

18         THE COURT:  They were default judgments in a lot of

19    cases.

20         MR. BERMAN:  In a lot of cases they were.  Not in his.

21         THE COURT:  But there are two lines you say.

22         MR. BERMAN:  Mr. Viruet specifically tried to vacate

23    his judgment and failed.

24         THE COURT:  But I don't know the grounds.

25         MR. BERMAN:  How it was litigated is before the state

DC33BERC

1    court.

2            THE COURT:  I don't know the grounds.

3            MR. BERMAN:  I understand that.  But Rooker-Feldman is

4    broader than that.  It is broader than, well, we can't tell the

5    grounds for the state court's decision, and because the grounds

6    are ambiguous and not apparent from the face of the opinion, it

7    is appropriate, nevertheless, to sit in judgment, as it were,

8    of the state court's decision.

9            I acknowledge Rooker-Feldman has narrowed over the

10   years, so this concept of appellate review has merged to the

11   fore of the jurisprudence.

12           THE COURT:  They are not asking for a ruling that the

13   state court was wrong.  They are arguing that improper

14   practices were used in the collection of debts.

15           MR. BERMAN:  When Mr. Viruet sought to vacate the

16   judgment, the basis for seeking vacatur was that improper

17   practices, bad service, and so forth, was used to obtain the

18   judgment, and the state court disagreed.

19           Mr. Viruet had a full and fair opportunity in the

20   state court to litigate the issue, to litigate the claim that

21   the judgment was obtained by improper practices.  If he chose

22   not to flesh out the argument in full before the state court,

23   then so be it.  It is not for a putative class then to reraise

24   it using him as a named plaintiff in the federal courts.  My

25   point is limited to that and really nothing else.

DC33BERC

1          With that, if the Court has nothing else.

2          THE COURT:  I have nothing else.

3          MR. BERMAN:  Thank you, Judge Patterson.

4          THE COURT:  I'm going to deny the motion for

5     arbitration.  I don't think the defendants have met their

6     burden to establish that a binding agreement was made that

7     require arbitration.  I'm relying on the Hines v.

8     Overstock.com, Inc. 380 Fed.Appx. 22, 24-5 (2d. Cir. 2010).

9          Furthermore, the arbitration provisions that were

10    supplied in the sample used the term "relating to."  As pointed

11    out in In re Spiegel, Inc., 206 WL 2577825 p. 10 n. 4 of the

12    Bankruptcy Court 2006, in the Southern District, pointed out

13    this is a classically broad term and has an expressly bilateral

14    nature.

15          Since defendants have not identified the arbitration

16    agreements that mandate arbitration of Roberts and Viruet, I'm

17    going to deny the motion.

18          The argument on the Rooker-Feldman doctrine, it seems

19    to me that the Rooker-Feldman doctrine doesn't really apply to

20    Viruet's claim because he's complaining of injuries caused by

21    the defendants' misconduct by filing a lawsuit with

22    insufficient information and review, and seeking default

23    judgments on the basis of false affidavits.  Not the state

24    court judgment itself.  Plaintiffs are relying on a Second

25    Circuit case Gabriele v. American Home Mortgage Servicing, Inc.

DC33BERC

```
 1    503 Fed.Appx. 89, which relied on that critical distinction.

 2    Therefore, I'm not going to dismiss Viruet's claim on those

 3    grounds.

 4            Since I'm not going to delay the decision on Bernhart

 5    and Brito at this point, I think that you can have the

 6    necessary discovery in connection with the class action motion.

 7    Plaintiff agree with that as I understand that it?

 8            MS. TARANTOLO:  Yes, your Honor.

 9            THE COURT:  I don't think the case should be delayed

10    for any additional discovery.  Let's get on with the case and

11    add up the legal fees.

12            When do you want to have your conference?

13            MS. TARANTOLO:  Your Honor, we would propose some time

14    in January, depending on the Court's schedule.

15            THE COURT:  You better do it before January.

16            MS. TARANTOLO:  Your Honor, we're prepared to do the

17    conference at any time.

18            THE COURT:  I have a criminal case, and I've got a

19    month.

20            MS. TARANTOLO:  We will be ready to go.

21            THE COURT:  It could fall apart in that month.

22            MS. TARANTOLO:  We'll be ready to go as soon as the

23    Court is available.

24            THE COURT:  What is a date convenient?  Why don't you

25    confer with your opponents and see if you have a date in mind.
```

DC33BERC

```
 1              MS. TARANTOLO:  Your Honor, to be clear, this is the
 2     date for a scheduling conference before the Court, not for the
 3     parties' own internal conference?
 4              THE COURT:  Right.
 5              MS. TARANTOLO:  Correct?
 6              MR. BERMAN:  Can we have, your Honor, some time to
 7     confer amongst ourselves and look at a calendar?  I don't know
 8     what co-counsel for the Pressler defendants, I have no idea
 9     what their schedule is.
10              MR. WILLIAMSON:  I'd like the opportunity to review my
11     calendar, which I don't have with me.
12              THE COURT:  Why don't you just advise me by letter
13     this week.
14              MR. WILLIAMSON:  That would be fine, your Honor.
15     Thank you.
16              MS. TARANTOLO:  Yes, your Honor.  Thank you.
17              THE COURT:  Okay.  If it is inconvenient, I'll let you
18     know.
19              MR. BERMAN:  Judge Patterson, if I may, solely for the
20     record because denial of a motion to compel arbitration is an
21     appealable issue, I want it to be noted for the record that we
22     are preserving all of our objections to the Court's finding.
23              THE COURT:  Fine.  Okay?  Anything else?
24              MS. TARANTOLO:  Nothing else, your Honor.  Thank you.
25              THE COURT:  Thank you.
```